FLEMING, by guardian *ad litem*, Appellant, vs. NORTHERN TISSUE PAPER MILL, Respondent.

*January 11—March 31, 1908.*

*Evidence: Weight: Physical impossibility: Master and servant: Defective machine: Notice: Question for jury: Presumption: Duty to warn: Appeal: Consideration of respondent's exceptions: Remanding for further consideration.*

1. In an action for damages for injuries to plaintiff's hand caused by the knife of a paper-cutting machine at which plaintiff was working, it appeared that the machine was operated by a lever, and was so adjusted that when in proper condition a pressure upon the lever would cause the knife to descend to a table and return to its former position and remain there until the lever was again pressed down; that under normal conditions the knife could descend only when the lever was pressed and but once for each pressure, so that the plaintiff, upon the knife returning to its position, could safely put his hands under it to remove the cut paper; that while plaintiff was reaching under the knife after it had returned to its position, it made a second downward movement, without the lever being pressed, and caused the injury complained of. Several witnesses who had worked on the machine testified that the knife would occasionally make a second downward movement with one pressure of the lever and would then run regularly as before without any readjustment. The jury found specially that the knife did make such a second downward movement, and that the machine was accustomed to get in a condition to permit this, and would thereafter continue to work all right. On defendant's motion the trial judge, while permitting the first finding to stand, set aside the second one, on the ground that, there being no evidence of any specific defects in the machine to which the abnormal movement of the knife could be attributed, and it appearing to be physically impossible, when the machine was in perfect condition, for the knife to make such a second movement, the testimony of the witnesses to the contrary could not be true. *Held* error, as the large amount of evidence to the effect that the abnormal movements of the machine occurred as claimed was not necessarily, under all the circumstances, wholly impeached by the physical impossibility of the occurrence if the machine was free from defects.

2. While, ordinarily, testimony that a machine made an unexpected movement which it could not have made if properly adjusted and in good repair is unworthy of belief, where it clearly appears that the machine uniformly before and after the alleged unexpected movement, without any readjustment, ran all right, and there was no discoverable defect therein, still the abnormal movements claimed in this case to have happened may, under all the circumstances, have occurred, and the trial judge was therefore not justified in overriding the decision of the jury finding such occurrence.

3. While one or several abnormal movements of a machine, not attributable to any defect which would become apparent by reasonable inspection, or to any defect at all, might not be sufficient to charge the employer with notice of any imperfection in the machine, an inherent infirmity, rendering the apparatus liable to make unexpected and abnormal and dangerous movements, as demonstrated by actual occurrences, commencing with the inception of its use and continuing for a long period of time, might be sufficient evidence of notice of such infirmity.

4. Ordinarily it is a question for the jury whether abnormal and dangerous movements of a machine have occurred with sufficient frequency to constitute notice to the employer of imperfection in such machine.

5. Serious dangers peculiar to a particular machine, manifested by occurrences in its operation from time to time, may be so long continued as by their very existence to raise a presumption of notice thereof to the employer.

6. Notice to defendant's superintendent of characteristics of a machine rendering it specially dangerous would be notice to the defendant, which does not lose its efficiency by a change of superintendents.

7. It is the duty of the master to warn a servant who he knows, or in the exercise of ordinary care ought to know, is inexperienced, as to those dangers to which he will be exposed in the course of his employment, which by reason of his inexperience he is ignorant of and which the master knows, or by the exercise of ordinary care ought to know, exist; and the mere fact that the machine in question is in good repair is not an exception to the rule stated.

8. A respondent may have the benefit of his exceptions to rulings in support of a judgment which would, otherwise, yield to appellant's exceptions, and may also take advantage in support of the judgment of any fatal defect in appellant's case not required to be brought to the attention of the trial court for a

ruling and exception in order to save the point for considera-
tion on appeal; but in the absence of anything of the character
mentioned preventing a reversal, he is not entitled to the bene-
fit of his exceptions taken in the court below, as on an appeal
by him, for the purposes of a new trial as a matter of right,
nor is he entitled to have a motion made in the court below,
but not passed upon, considered on appeal.

9. Where defendant moved to change certain answers of a special
verdict and upon such changes being made to enter judgment
for him, and also moved to set aside the verdict and grant a
new trial, and his first motion was granted, *held*, he was not
entitled, on appeal by plaintiff, where the trial court's action
on his first motion was reversed, to have his second motion,
not passed upon by the trial court, considered, but the cause
should be remanded to give the lower court opportunity to de-
cide the questions not previously disposed of, notwithstanding
sec. 3701, Stats. (1898), providing that a new trial should fol-
low a reversal only when necessary.

APPEAL from a judgment of the circuit court for Brown
county: S. D. HASTINGS, Circuit Judge. *Reversed.*

Action to recover compensation for an injury claimed to
have been caused by actionable negligence of the defendant.

The negligence complained of was the act of setting plaint-
iff to work at a machine for cutting tissue paper without in-
forming him of the danger to be faced, knowing that he
was wholly ignorant of the fact known to it that the cutter
knife on the machine, in case of the machine being im-
properly adjusted or equipped or out of repair, was liable to
make an unexpected downward movement to the table be-
fore which plaintiff was required to stand and on which in
the course of his work he was required to place his hands so
that in case of such movement the knife was liable to cut
his hands.

It was alleged in the complaint that the machine was op-
erated by a lever, and was so adjusted that, when in proper
condition, pressure upon the lever would set in motion the
mechanism connected with the knife, causing it to descend
to the surface of the table and go back to its former position

and remain there till the lever was again pressed down; that under normal conditions the knife could not descend unless the lever was pressed down, and could not make a second downward movement till the lever was again so pressed, so the attendant, upon the knife going up to its position of rest, was safe in putting his hands under it for the purpose of removing paper cut by the last downward movement; that plaintiff when put at work did not know, and had no reason to know, that the knife would move otherwise than as aforesaid; that on or about the day he was put to work the machine had become so conditioned on account of want of repair or proper adjustment or equipment that while plaintiff was in the due performance of his duties the knife made a downward movement after the one immediately following pressure upon the lever, which second movement caught plaintiff's right hand and so wounded it as to cause him to lose four fingers of that hand.

The defendant answered, putting in issue all allegations respecting the cutter machine having been out of repair, or there having been any abnormal movement of the knife, and pleading familiarity by plaintiff with the machine, and further pleading contributory negligence.

There was no question on the evidence but that plaintiff was wounded by the cutter knife descending upon his hand to the extent stated in the complaint. He testified that he pressed the lever down in the regular course of his employment, causing the knife to descend, and that upon its going back to its place, where under normal conditions it would have remained till he again put the lever down, he reached under it to remove cut paper and the knife immediately descended, causing his injury. The only corroboration of his testimony was proof of an exclamation regarding how the injury occurred which he made immediately thereafter.

There was evidence tending to show that plaintiff was not familiar with the machine so as to have reason to expect any

abnormal movement of the cutter knife, such as caused his injury; that no information in that regard was given to him up to the time of such injury.

There was evidence by several witnesses to the effect that from the time the machine was put in operation in defendant's mill it had occasionally operated the same as plaintiff claimed it did on the occasion in question, and that the superintendent of the mill was notified thereof. The testimony was to the effect that from time to time upon the knife being put in motion, without the lever being pressed down a second time the knife would make a second or more downward movements and then go back to its highest point and stop and not move again except in response to a second pressure upon the lever. There was evidence to the effect that such an abnormal movement of the knife was impossible when the machine was in a proper state of repair and in proper adjustment, and evidence that the machine operated regularly before the accident and when tested several times thereafter, though nothing was done to change it from the condition it was in when the accident occurred. There was no evidence of any imperfection, except perhaps a slight wearing, or breaking off, of a small piece of a projecting casting on the under side of the lever, designed to be engaged by a casting on the shaft below upon the latter making a complete revolution, disengaging the mechanism transmitting power to such lower shaft which operated the knife, and a slight wearing off of one or two projecting points of such casting so designed to engage the one on the lever. There was some evidence that dirt gathering in the friction clutch set by the downward movement of the lever, or the machine not being properly oiled, or worn condition of such projecting parts, or some other undiscoverable cause might have prevented the friction clutch on the occasion in question from releasing, as it should have done, after one revolution of the lower shaft.

The driving shaft was armed with a clutch collar which, by the downward pressure of the lever was moved against a shell pulley which was around a small friction pulley on the shaft with a steel band between the inner rim of the shell and the outer rim of the friction so adjusted as, upon such collar being pressed up by the downward movement of the lever, to tighten the steel band, which was theretofore loose, upon friction causing the lower shaft to put the cutter knife in motion, upon the driving shaft in the condition indicated, making a full revolution, causing the knife to make a full movement, the casting designed to strike the upper part of the lever as aforesaid would come to its place, strike the projecting point upon the lever, throw it up, causing the clutch collar to move back from the shell pulley, disengaging the mechanism which pressed the band against the friction pulley, allowing such band, which was constructed to that end, to open sufficiently to cease transmitting power to the lower shaft and to put in play a brake so as to prevent the momentum of such shaft and its connections from causing any movement of the knife after such release.

It was absolutely necessary, in order that the knife should come to a rest after having descended and gone back to its highest point, that the steel band should open and become free from the friction pulley. Anything which would prevent such disengaging of the band would cause an abnormal movement of the knife, and anything which would prevent the brake from properly acting would be liable to cause the knife to overrun but not to make a full movement and then come to a stop. The tendency was in case of such an overrun for the knife to stay down till put in motion again by a resetting of the friction. Ordinarily upon the knife being put in motion the mechanism designed to raise the lever was bound to do it, automatically, upon one revolution of the driving shaft being completed, causing one full movement of the knife, and in case of the lever being so raised the mechan-

ism was such that the clutch collar would, necessarily, be forced back and the steel band would necessarily cease to engage the pulley inside the shell, if everything was in proper adjustment.

The jury rendered the following verdict:

"(1) Was the plaintiff, while in the defendant's employ, on July 22, 1904, injured by having the four fingers on his right hand cut off by the knife on a paper cutter, which he was operating? *A*. Yes.

"(2) Were the plaintiff's fingers so cut off by the knife coming down a second time, after the plaintiff had last pressed the lever? *A*. Yes.

"(3) If your answer to the last question should be 'Yes,' then answer this: Was said machine liable to get in a condition in which, when being used, the knife would come down to the table a second time, immediately following a single pressure of the lever, and then thereafter continue to work all right? *A*. Yes.

"(4) If you answer the third question 'Yes,' then answer this: Did the defendant know that said machine was liable to get in such condition before the plaintiff was injured? *A*. No.

"(5) If you answer the fourth question 'No,' then answer this: Had said machine so operated for such length of time that said defendant in the exercise of ordinary care should have known that said machine was liable to get in said condition before the plaintiff was injured? *A*. Yes.

"(6) If your answer to the fourth or fifth question should be 'Yes,' then answer this: Did the defendant, at any time before his injury, explain to and warn the plaintiff against the danger to a person using said machine for cutting paper rolls, from the liability of said knife to come down a second time after one push of the lever? *A*. (by the court) No.

"(7) If your answer to the second, third, and either the fourth or fifth questions should be 'Yes,' then answer this: Was said defendant negligent in not explaining to and warning said plaintiff against said danger? *A*. Yes.

"(8) If you answer the last (seventh) question 'Yes,' then answer this: Was said negligence the proximate cause of the plaintiff's injury? *A*. Yes.

"(9) Was the plaintiff negligent in any particular which contributed to his injury? *A.* No.

"(10) At what amount do you assess the plaintiff's damages as the direct and proximate consequence of his injury? *A.* Five thousand dollars ($5,000).

"(11) If you should answer the second question 'Yes,' then answer this: Was a cause of said knife coming down the second time

——dirt on the friction clutch resulting from the machine not being kept clean? *A.* ——.

——the machine not being properly oiled? *A.* ——.

——some substance getting on the friction clutch although the machine was kept clean? *A.* ——.

——the worn condition of the dog? *A.* ——.

——some cause not disclosed by the testimony? *A.* ——.

"We cannot answer the above question categorically, but we find that some one or more of the above causes caused the knife to come down a second time with one pressure of the lever."

Defendant moved the court to change the answer to the second question from "Yes" to "No" and to likewise change the answers to the third question, fifth question, seventh and eighth questions, and to make some other changes, upon the ground that such course was required by the undisputed evidence, and further moved that upon such changes being made judgment should be rendered in defendant's favor.

As an alternative motion defendant's counsel moved the court to set aside the verdict and for a new trial upon several grounds. The motion to change the answers to the third, fifth, and seventh questions was granted upon the ground that the evidence demonstrated that the cutter machine was in perfect working order and that testimony as to abnormal movements of the knife having occurred from time to time before the accident was so highly improbable as not to be worthy of belief; that there was no testimony establishing to any reasonable certainty under any view of the case any cause for the abnormal movement of the machine claimed to

have occurred at the time of the injury, and that undisputed evidence as to the operation of the machine before the accident and thereafter effectually rebutted any presumption of improper condition of the machine at the time of the accident, unless it was some unexpected difficulty which occurred just before the accident and which was remedied immediately thereafter or before the machine was again put in operation. The court further intimated as to the fifth question, without deciding, that if the fact be that prior to the accident the machine had from time to time operated irregularly it was, so far as indicated by the evidence, witnessed by the attendant only, and as there was no evidence that information thereof actually reached the defendant, it was not chargeable with knowledge thereof; that the doctrine of constructive notice does not apply to the case.

The court refused to disturb the answer to the second question upon the ground that there might have been some defect in the machine caused immediately before and existing at the time of the accident, producing the abnormal motion of the knife, which was remedied before it was again put in operation; that if the knife did come down twice at the time of the accident and nothing was done to the machine before it was again put in operation it would impeach the testimony that it worked all right thereafter, and if it be true that it then worked all right without anything having been done thereto, that would impeach the testimony that the knife made the second movement testified to by the plaintiff, and that as between the two situations the verdict of the jury should stand. Judgment on the verdict as corrected was rendered in defendant's favor.

For the appellant there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.*

For the respondent there was a brief by *Greene, Fairchild, North & Parker,* and oral argument by *H. O. Fairchild.*

The following opinion was filed January 28, 1908:

Marshall, J.   Did the court err in holding that the evidence was not sufficient to support the answer of the jury to the third question?   Each of six apparently disinterested and credible witnesses testified that he worked at the cutter machine before appellant was injured and that occasionally the knife made a second downward movement with one pressure of the lever.   Some of the witnesses testified that, at times, the knife would make more than a second such movement.   Others testified that upon the machine so operating, some readjustment was made and then that it ran all right, and still others testified that after making one second downward movement it was liable to run regular as before without any readjustment.

The testimony of David Robinson is a fair sample of that of the other witnesses.   It is in substance as follows: I worked at the paper-cutter machine before *Fleming* was injured.   The knife came down a second time more than once while I worked with the machine.   I should say it did three times.   The second drop was not in response to a second pressure upon the lever.

Arthur Howarth testified that he worked with the machine and that the knife would occasionally make a second downward movement; sometimes once, twice or three times in succession, usually in the morning.   That it did so sometimes on two or three occasions in a week.

Oliver Latour testified substantially the same way.   He said that at times the knife would repeat more than once in response to one pressure upon the lever.   That it would go down a second or third time, stopping on the last occasion before it got clear down, and that he spoke to James Salters, who was the superintendent, about it.

There was a large amount of the class of testimony indicated in connection with the evidence of appellant that his

injury was caused by a second unexpected downward move-
ment of the knife and evidence conflicting therewith. The
evidence as a whole was uncontroverted that the abnormal
movement of the knife testified to by appellant, if it oc-
curred, happened under the same conditions as those said
to have occurred prior to the accident. It must be conceded
that if the evidence of this large number of witnesses is cred-
ible, a strong case was made that the cutter knife during all
the time the machine was used in the mill, covering a pe-
riod of some four years, was accustomed to operate as it did
when appellant was injured. The upshot of the matter is
that six, at least, apparently fair witnesses probably com-
mitted perjury or there was room in the evidence for the
jury's answer to the third question.

The trial judge met the situation stated, as indicated in
the history of the case, by holding that since there was no
evidence of any specific defect in the machine to which the
abnormal movements of the knife could be attributed, and
it appeared to be physically impossible for such knife to
make such a second or third downward movement as the
witnesses testified occurred, their testimony was not worthy
of belief; that the same was contrary to "nature's unchang-
ing and unchangeable laws and the unvarying and invari-
able principles of mechanics," and so could not be true.

The judge had very superior advantages, it must be ad-
mitted, for determining whether the witnesses testified to
the truth. He saw the machine and its mode of operating
and thus had the best opportunity that could well be afforded
for fully understanding the evidence, and in the light thereof
he reached the conclusion that upon the shaft operating the
cutter knife making one complete revolution, the lever,
which was pressed down to start it in motion, would neces-
sarily be thrown up, positively causing the clutch to slide
away from the shell, when, instantly, the steel band would,
necessarily, cease to engage the friction and the brake would

be set, compelling the knife to remain motionless at its highest point from the cutter table, where it would necessarily remain till the clutch was again pushed against the revolving shell by another downward movement of the lever.

After giving full weight, as we must, to the circumstance that the judge had the superior advantage mentioned and the rule that in such a situation a trial judge's conclusion should not be disturbed except upon its appearing to be clearly wrong (*Powell v. Ashland I. & S. Co.* 98 Wis. 35, 73 N. W. 573; *Nolan v. Kroening,* 130 Wis. 79, 109 N. W. 963), it is the opinion of the court that the very large amount of evidence from the mouths of witnesses to the effect that the cutter machine did in fact operate exactly as the jury found, is not wholly impeached.

True, if the mechanism of the machine was such as to render the abnormal movement of the knife claimed to have happened impossible, then the testimony of any number of witnesses that it did make such a movement would not warrant the jury's finding. True, also, ordinarily testimony that a machine made an unexpected movement which it could not have made if properly adjusted and in a proper state of repair, is unworthy of belief in the face of a clear case that the machine uniformly before and after the alleged unexpected movement, without anything being done to change it in any way, ran all right and there was no discoverable defect therein. *Vorbrich v. Geuder & P. Mfg. Co.* 96 Wis. 277, 71 N. W. 434; *Chybowski v. Bucyrus Co.* 127 Wis. 332, 106 N. W. 833; *Dingley v. Star K. Co.* 134 N. Y. 552, 32 N. E. 35; *Redmond v. Delta L. Co.* 96 Mich. 545, 55 N. W. 1004. It is to be noted that in all, or substantially all, cases of the character of those cited, there was but one or a few unexpected or abnormal movements claimed to have occurred, one happening at the time of the accident, and the occurrence itself was relied upon to show imperfection in original construction, or some want of repair of the appa-

ratus, the doctrine *res ipsa loquitur* being invoked. However, it must be confessed that ordinarily a physical situation which would unquestionably impeach the evidence of one witness would likewise impeach evidence of the same character of any number of witnesses. It is nevertheless true that under some circumstances what might appear to one impossible, supported by the testimony of a single interested witness, as was the case in most of the authorities referred to and others of like character, might not so appear upon an investigation stimulated by the testimony of so large a number of apparently disinterested witnesses as to render it at least next to impossible that they all testified falsely.

Facing the testimony of the numerous witnesses here as to what did in fact occur, not once or twice only, but many times during a period of years, after the most careful consideration thereof and study of the whole situation and with due regard to the decision of the learned circuit judge, the opinion has been reached by the court that the abnormal movements of the machine claimed to have happened may have occurred. The witnesses could not have been mistaken. They testified to the truth or they individually knowingly testified falsely. The machine was obviously of a somewhat complicated character. The most accurate adjustment of many parts of many kinds was required to produce instant and certain operation of the entire combination and bring about, under all conditions of work, the particular result designed and none other. The jury saw the apparatus. They had all the facilities which the circuit judge had for discovering the truth and were probably quite as capable as he was of determining whether it was possible for the machine to repeat as claimed.

In submitting the second question the learned circuit judge so fenced it about as to center the thought of the jury upon the precise point of whether it was possible for the machine, assuming that it was in perfect condition, by rea-

son of some interference operating for an instant only, to run regular up to such instant and then make an abnormal movement as claimed, and immediately thereafter run regular again without anything being done to remedy the interference, except such as might occur automatically. To make it doubly sure that the dominant question would not be lost sight of, they were instructed as to the third question that in case of an affirmative answer to the second they would necessarily have decided that it was within reasonable probability that the machine might have operated as claimed by the various witnesses. In that situation the jury decided that the evidence of such witnesses was credible and that what they claimed was the truth to a reasonable certainty.

Under all the circumstances it is the opinion of the court, as indicated, that such dominant influence cannot well be given the decision of the circuit judge on the question of fact as to override the decision of the jury. Within the rule of *Powell v. Ashland I. & S. Co.* 98 Wis. 35, 73 N. W. 573, and similar cases, it is considered that the former is clearly wrong. Though the machine was in proper condition, and when operated merely to exhibit its movements, no work being done, it would run regular with absolute certainty, under working conditions it might, within reasonable probabilities, occasionally, because of being affected by dirt or want of oil or by being fouled with dirt and oil forming a sticky substance, or from some other interference, repeat the motion of the knife as claimed. It is not considered that in order to come to such conclusion it is necessary to reach a decision as to there having been any specific defect in the machine, discoverable by inspection, or that there was any defect in the apparatus, strictly speaking. The case was submitted to the jury upon the theory that if there were any inherent infirmity in the apparatus rendering it liable to habitually, so to speak, not necessarily frequently, but occasionally, under working conditions, make

the dangerous abnormal movements testified to; that warranted an affirmative answer to the third question. We approve of such submission and hold that the result should not have been disturbed upon the ground of impossibility of the alleged occurrences having happened.

In reaching the foregoing conclusion we have not overlooked the direct evidence that the machine could not have operated as respondent's witnesses claimed and other evidence tending to show that it did not so operate. Such conclusion does not reach the question of whether, had the court set the verdict aside as contrary to the weight of the evidence and granted a new trial, the ruling could properly be disturbed. That question is not here, since it has not yet been closed in the court below unless by permanent displacement by the granting of respondent's primary motion. That matter we will refer to later.

Respondent's counsel excepted to the refusal to change the answer of the jury to the second question. That exception is relied upon in support of the judgment. If the answer should have been changed, as requested, then the judgment is right irrespective of any other question in the case. Such exception is grounded on the reason given by the court to support the ruling as to the third question, which we have condemned. The fatal infirmity in the ruling as to the third question is likewise operative against respondent's exception as to the ruling respecting the second question.

We have not been able to understand how the answer to the second question, based as it was, as the jury understood the case, upon the theory that it was within reasonable probabilities that the knife repeated, as claimed, could logically have been allowed to stand while the answer to the third question, based upon the same support, was changed, making the two answers in the perfected verdict opposed to each other.

There can be no mistake but that the answer to the second

question was made to turn with the jury, as we have indicated. They were in effect told that an answer in the affirmative to the second question would justify, if it did not require, a like answer to the third question, as will be seen by referring to the instructions as to the former in connection with those as to the latter. Here is the language first used. Its meaning is unmistakable:

"But if you are satisfied from the whole testimony in the case that it was possible for the machine to be in that condition to work all right immediately before, and again immediately after, the time in question, and because of some temporary condition existing at the moment, and then ceased to exist before the next push of the lever, the machine could work as the plaintiff claims, then it is left a question for you to determine from all the testimony in the case, whether it did so operate, whether the knife did come down a second time, as claimed by the plaintiff at the time he was injured."

Then follows this as to the third question:

"You will only reach this question, as I said before, in case you have answered the second question 'Yes,' and should you so answer this question, the second question, you will have necessarily found that it was possible that it could so operate."

The learned court reversed the answer to the fifth question by which the jury found that the machine had operated irregularly as to secondary movements of the knife for such length of time that defendant in the exercise of ordinary care should have known it was liable to get in said condition before the plaintiff was injured. That ruling, primarily, went upon the ground that it was called for by the court's action as to the third question. As such action cannot stand the consequential ruling indicated must fall also.

True, the court further raised the question, without deciding it, as to whether the abnormal movements of the knife, if they occurred, were evidence of notice other than to the persons who witnessed them. One such circumstance, or

several, not attributable to any defect which would become apparent by reasonable inspection, or any defect at all, strictly so called, might not be sufficient to charge the employer with notice of any imperfection in a machine, but an inherent infirmity, rendering the apparatus liable to make unexpected abnormal and dangerous movements, as demonstrated by actual occurrences, commencing with the inception of its use and continuing for a long period, might be sufficient evidence of notice of such infirmity. It is considered that the period might be so long as to so operate as a matter of law. No authority squarely with the situation here is cited to the contrary by respondent's counsel, and none supporting the proposition, squarely, by appellant's counsel, nor do we find any case law covering the precise question under the same or similar circumstances. But, on principle, the characteristics of a machine, ordinarily safe, as to dangers peculiar to its use, especially after the same has been in operation for a long period of time, may reasonably be regarded as within the knowledge of the person charged with the duty to exercise ordinary care for the safety of those employed to attend it. When the proof of notice would be thus circumstantially complete must vary with the facts of each particular situation. As to dangers incident to the use of all machines of the kind the employer would doubtless be chargeable with notice from the start, and as to dangers peculiar to the particular machine, a short period of time or a long period might, according to circumstances, be sufficient. The time might be so short as to leave the employer without notice as a matter of law, and might be so long as to charge him with notice as a matter of law. Ordinarily the question would be one for the jury.

It is the opinion of the court that *Vorbrich v. Geuder & P. Mfg. Co.* 96 Wis. 277, 71 N. W. 434; *Carnegie S. Co. v. Byers*, 149 Fed. 667, 669, and like cases relied upon by

respondent's counsel as showing that abnormal movements of a machine do not suggest the existence of defects which are not discoverable by the exercise of ordinary care, do not apply here. As indicated, this case was not submitted to the jury to decide as to whether the machine had such defects, but as to whether, conceding it was perfect in its parts and adjustment, it was of such a character that, under conditions created by actual work, notwithstanding such attention as was ordinarily given thereto, it might be that it would occasionally make an abnormal movement such as was claimed to have been made, not from any defect strictly so called, not from any want of repair in the ordinary sense, but as indicated, an infirmity inherent in the very nature of the contrivance.

Neither does it seem that *Dahlke v. Ill. S. Co.* 100 Wis. 431, 76 N. W. 362, and similar cases holding that an employer is not required to inform his servants of special dangers in working with machinery which are liable to exist under conditions not reasonably to be apprehended, apply to this case, except in support of the conclusion we have reached. If the cutter machine did occasionally operate abnormally when in actual service and such occasional abnormal operation was habitual and inherent in the very nature of the contrivance when in service, then the conditions producing such movements were reasonably to be apprehended.

Again, we are unable to see how *Walkowski v. P. & G. Consol. Mines,* 115 Mich. 629, 73 N. W. 895; *Cameron v. N. Y. C. & H. R. R. Co.* 145 N. Y. 404, 40 N. E. 1; *Cregan v. Marston,* 126 N. Y. 568, 27 N. E. 952, and similar cases, support the claim that abnormal operations at times, under working conditions, of an ordinarily perfect machine, such abnormal operation being a characteristic of the contrivance, are not evidence of notice to an employer using the same, of such characteristic. The cited authorities are to the effect that mere acts of a servant inconsistent with competency,

happening under such conditions as to leave no trace behind, which would ordinarily attract the attention of the master, are not sufficient evidence of notice of the incompetency. The rule is familiar.

In this connection we are referred to 1 Wigmore, Ev. § 252, which recognizes the doctrine that notice of the dangers characteristic of a machine may be held to have reached an employer when the danger is such as to be generally known among those who work, or have worked, with it and is of such a nature as to be liable to be talked about, and the employees have been subjected to such danger for a considerable length of time. That fits this case fairly, especially in view of the fact that it is undisputed that the attention of Salters, who was superintendent of the mill some time prior to the accident, was specially called to the characteristics of the machine.

The learned counsel for respondent suggest that the notice to Salters is of no importance, because he was not superintendent at the time of the accident. Such circumstance does not seem to at all impair the force of the evidence on the mere question of constructive notice. *McDonald v. Fire Asso.* 93 Wis. 348, 67 N. W. 719, and similar cases, cited by counsel at this point, which are to the effect that a principal, in regard to the transaction conducted for him by the agent, is not bound by information which the agent obtained outside his agency, unless the agent has such knowledge in mind at the time of such transaction, do not seem to have any application. Manifestly, notice to a superintendent of characteristics of a machine rendering it specially dangerous would be notice to the principal, and such notice by no means would lose its efficiency by a change of superintendents. We apprehend the jury found in respondent's favor as to actual knowledge upon the theory that there was no such knowledge unless the superintendent conveyed the information he received to some officer of the company, though they

gave some weight to the evidence in question on the subject of constructive knowledge.

It is not considered advisable to pursue this subject into much detail. We hold on principle, as indicated, that serious dangers peculiar to a particular machine, as manifested by occurrences in its operation from time to time; dangers which should, in the exercise of ordinary care, be brought to the attention of an inexperienced person upon his being put to work at such machine, unless the employer is excusably ignorant thereof or of such inexperience, may be so long continued as by their very existence and manifestation to raise a presumption of fact as to notice thereof to such employer. The familiar rule applies to the situation that it is the duty of the master to warn a servant who he knows, or in the exercise of ordinary care ought to know, is inexperienced, as to those dangers to which he will be exposed in the course of his employment, which by reason of such inexperience he is ignorant of and which the master knows, or by the exercise of ordinary care ought to know, exist. *Wolski v. Knapp-Stout & Co. Co.* 90 Wis. 178, 63 N. W. 87; *Dahlke v. Ill. S. Co.* 100 Wis. 431, 76 N. W. 362; 26 Cyc. 1165. The mere fact that the machine in question in any given case is in good repair is not an exception to the rule stated. *May v. Smith,* 92 Ga. 95, 18 S. E. 360; 4 Thomp. Comm. on Neg. § 4071.

A machine may establish a character, so to speak, the same as continuous negligent acts of an employee may do, though they do not produce any observable indication which survives them. Such character with evidence of specific acts is evidence of notice to the employer. *Park v. N. Y. C. & H. R. R. Co.* 155 N. Y. 215, 49 N. E. 674; 4 Thomp. Comm. on Neg. § 4910, and notes.

There is no other infirmity in appellant's case, so far as we can discover, which can justify the judgment appealed from. The special verdict covered the case so far as the facts

were controverted. It was undisputed that appellant was ignorant of the liability of the machine to make the dangerous movements which caused his injury. They were of such peculiar character that respondent had no right to assume, in the absence of special knowledge to the contrary, and there was no such knowledge, that appellant knew of the special danger. So there was no question of fact in regard to such matters to go to the jury. Upon the record with the disputed facts settled in appellant's favor without harmful error, he was entitled to judgment.

No other question discussed in the briefs of counsel need be considered, except the claim on the part of respondent's counsel that in case of a reversal of the judgment, which, as we have seen, is inevitable, their exceptions and the alternative motions in the court below should be considered on the question of whether a new trial should be ordered or judgment awarded for appellant.

It is elementary that a respondent may have the benefit of his exceptions to rulings, in support of a judgment which would, otherwise, yield to appellant's exceptions. Respondent may also take advantage in support of the judgment of any fatal defect in appellant's case not required to be brought to the attention of the trial court for a ruling and exception in order to save the point for consideration on appeal. But in the absence of anything of the character mentioned preventing a reversal, respondent is not entitled to the benefit of his exceptions taken in the court below, as on an appeal by him, for the purposes of a new trial as a matter of right, nor is he entitled to have a motion made in the court below but not passed upon considered on appeal.

We cannot agree with counsel for appellant that, because the primary motion made by respondent's counsel was granted, the alternative motions entirely dropped out of the case. Such a practice might work great injustice. The secondary motions could not considerately have been made

in any other way than they were made.   The effect of the favorable decision on the primary motion was to leave it unnecessary, and perhaps impracticable, to pass on the others. The effect of the reversal as to such primary motion is to bring into prominence the others and require them to be passed upon, and necessarily by the court below in the first instance.   Doubtless we may properly look into the record sufficiently to discover whether, in any reasonable view of the case, such secondary motions are worthy of consideration, and if not remand the case so as to end the litigation, since a new trial is required to follow a reversal here only when necessary.   Sec. 3071, Stats. (1898).

It is considered, in this case, that justice will be most certainly done in the end by giving the trial court opportunity to decide the questions properly brought to its attention by the motions which it did not pass on, that have not been necessarily indirectly decided on this appeal, and to render judgment or grant a new trial according as the decision as to such motions and what is here said may require.

*By the Court.*—The judgment and order changing the verdict of the jury are reversed, and the cause is remanded for further proceedings according to this opinion.

A motion for a rehearing was denied March 31, 1908.