CHYBOWSKI, Respondent, vs. BUCYRUS COMPANY, Appellant.

*February 5—February 23, 1906.*

*Trial: Impaneling of jury: Interrogation of opposing counsel: Court and jury: Master and servant: Personal injuries: Defective machinery: Evidence: Burden of proof.*

1. On the trial of an action for personal injuries to a servant, plaintiff is not entitled to interrogate defendant's counsel, either at the bar or on the stand as a witness, as to whether an insurance company is pecuniarily interested in the litigation.

2. When the evidence in relation to a controverted question of fact on the one side accords with what must necessarily have been the case under given undisputed and indispensable circumstances, and the evidence on the other side is opposed thereto, there is no room for conflicting reasonable inferences, and hence no question for solution by a jury.

3. Whether such situation does or does not exist in any case is a matter for the court to determine, and it should do so even

without a motion in that regard. Refusal so to do, in the face of a proper motion, is no less than the denial of a right.

4. In an action for personal injuries alleged to have been caused by the improper working of a steam hammer, the construction of the machine is *held* to present such positive demonstration of impossibility of the accident complained of that the contrary evidence of the operatives of the machine did not raise any conflict for solution by the jury.

5. In an action for personal injuries to a servant from an alleged defective machine, satisfactory proof that the machine worked perfectly both before and after the accident casts the burden on plaintiff to show that its alleged defective action was caused by a defect in the machine.

APPEAL from a judgment of the circuit court for Milwaukee county: ORREN T. WILLIAMS, Circuit Judge. *Reversed.*

Action to recover for personal injuries. Plaintiff complained that while in the employ of defendant the latter failed to furnish him a reasonably safe place in which to do his work, in that his working place was in close proximity to a steam hammer so defective that it was liable to deliver two blows when only one was intended and without any manipulation of the controlling levers for the second strike and thereby cause the drift pin, used on the occasion in question, if moved out of its place or turned over by the first blow, to fly from its location under the hammer with great force, and to injure any person who might be within its range; that plaintiff was injured in that way, his right leg being fractured above the knee. Judgment was asked in the sum of $10,000. Defendant answered putting in issue all allegations in respect to the hammer being defective.

During the impaneling of the jury plaintiff asked defendant's counsel if a certain insurance company was not pecuniarily interested in the litigation. The latter objected to being so interrogated in the presence of the jury, and still further objected to being interrogated at all in his place as defendant's representative, and compelled to answer the questions. He was then called to the stand as a witness and sworn. The

·question was then repeated to him and, under protest, by order of the court he was compelled to answer, which he did in the affirmative.

The mechanism which it was claimed caused the injury ·consisted of a hammer weighing about 1,250 pounds, a piston rod, piston head, and cylinder set in a vertical position with ·such connections that by a proper manipulation thereof the hammer could be caused to drop, striking whatever was on ·the hammer bed with its own weight accelerated by a steam pressure of from seventy to ninety pounds to the square inch and to rise *again to its position* and repeat the blow as ·often as desired, but only by manipulation of the operating lever. There were two levers. One was to control the steam as to turning it on or off from the boiler, and the other ·to control the application of the steam as to applying it below the piston head to raise the hammer, exhaust it to permit the hammer to fall, and to apply it above the cylinder head to add the force thereof to the gravity power of the falling weight.

There was no way by which the hammer could be raised to deliver a blow, except by drawing the steam lever and raising the operating lever. There was no way by which a blow could be delivered except by putting down the operating lever. If ·a blow was desired combining the falling weight of the hammer and the steam pressure also, that was accomplished by pressing down the operating lever while the steam was on. If a blow was only desired of the falling weight of the hammer, that was accomplished by shutting off the steam and putting the operating lever down. There was no automatic shutting off or on of the steam, or turning in of the steam above or below the piston head. Every movement of the hammer was positive following the appropriate movements of the operating lever and steam lever.

The evidence, in the main, was directed to the point of ·whether on the occasion in question the hammer struck two

blows when only one was desired, or in other words, whether, the appliance being manipulated to strike one blow, two blows were delivered without any movement of the levers. There was evidence for the plaintiff by the boy who operated the levers on the occasion in question, and who had operated them for weeks prior thereto, that the hammer was accustomed to strike two blows when only one was desired, and to deliver the second blow without any change in the controlling lever; that he made complaint on several occasions to the boss of the department, who promised to fix the machine. He testified that if the levers did their work properly the machine could not work that way. He attributed the second blow of the hammer to some defect in the machine, but suggested no particular defect, and suggested no cause whatever except a leak of steam. There was other testimony on the part of plaintiff to the effect that a second blow might be caused when only one was desired by water in the cylinder, or by a leak of steam around the piston head where it entered the cylinder. The evidence on the part of defendant was to this effect: The hammer worked perfectly prior to the occurrence in question and thereafter. It was an utter impossibility for such a hammer to rebound after striking a blow and strike a second blow as testified to by plaintiff's witness; that such a movement would render the hammer worse than useless. The hammer could only be raised by turning on the steam and raising the operating lever letting steam in below the piston head. So long as the operating lever remained up and the steam on, it was an utter impossibility for the hammer to fall because the full pressure of the steam in the boiler would extend to the cylinder head. The cylinder head could not descend, allowing the hammer to drop, without compression of the steam and back pressure on the boiler, which was an impossibility, the pressure customarily being seventy to ninety pounds to the square inch. The hammer after being raised by the steam pressure could not be made to fall otherwise than by shutting off the

steam and dropping the operating lever. No movement of the hammer was possible except in response to proper movements of the levers mentioned, the one designed to turn on and off the steam and the other to apply it.

At the close of the evidence defendant's counsel moved the court to direct a verdict in favor of defendant. The motion was denied. The jury rendered a special verdict, finding, in effect, as follows: The steam hammer was out of repair, causing it to strike two blows when only one was desired, notwithstanding proper manipulation of the controlling levers by the hammer-boy. That defective condition of the hammer was the proximate cause of plaintiff's injury. The defendant, by the exercise of ordinary care, might have known of such defective condition of the hammer for a sufficient length of time before the accident to have remedied the same. The plaintiff was not guilty of any want of ordinary care contributing to the injury. Three thousand dollars will be required to compensate him for his injury.

After verdict defendant's counsel moved the court to change the finding in respect to the hammer being defective and striking two blows when only one was desired, so as to negative any such condition, and by striking out the finding in respect to the hammer being defective, as claimed by plaintiff, and the defects having existed so long that defendant, by the exercise of ordinary care, might have discovered them a sufficient length of time before the accident to have remedied the same, and to give judgment in its favor of no cause of action. The motion was denied. The court then, on motion, rendered judgment in favor of plaintiff for the amount of damages found by the jury.

For the appellant there was a brief by *Hoyt, Doe, Umbreit & Olwell*, and oral argument by *J. B. Doe*.

For the respondent the cause was submitted on the brief of *K. Shawvan*, attorney, and *Ryan, Ogden & Bottum*, of counsel.

Chybowski v. Bucyrus Co. 127 Wis. 332.

MARSHALL, J.  In *Faber v. C. Reiss C. Co.* 124 Wis. 554, 102 N. W. 1049, it was held that a juror may properly be interrogated upon the *voir dire* as to whether he is in the employ of or in any way concerned with any insurance company which is pecuniarily interested in the litigation, the examination being conducted in the presence of jurors already in the box and those not yet drawn, if thought best, and in such reasonable manner as not to place improper matters before them or suggest impropriety in the company's connection with the case.  In other words, such examination is proper so long as conducted "strictly within the right" to discover the state of mind of the juror as regards the matter in hand or any collateral matter reasonably liable to unduly influence him.  The learned circuit court seems to have considered the conclusion in that case with what was said in support thereof as warranting the extraordinary proceeding detailed in the record.  If there is anything in the former case suggesting the propriety of requiring counsel to state either from his place as such or from the stand as a witness, as was done here, whether an insurance company is concerned in the litigation, we are not conscious of it.  It would seem that the words in the former case to the effect that the questions propounded must be to the juror and "strictly within the right" as to his status respecting the controversy in hand, by necessary implication, condemn the proceeding under consideration.

The mere fact that an insurance company was concerned in the litigation was wholly immaterial.  The attitude of the court as to compelling appellant's counsel to bear evidence in respect thereto, notwithstanding assurance of respondent's counsel that the information sought for was wanted only as a basis for interrogating the juror, clearly gave undue importance to the insurance company's connection with the case since no such basis was necessary.  It was a matter quite likely to prejudice the jury and should not have been adverted to at all except by questions to the particular juror under examina-

tion and "strictly within the right" to discover whether any bias or basis therefor on his part existed. The pretense that it was necessary to interrogate counsel, as was done, to obtain a basis for such discovery should not have appealed successfully to the court.

All cases, but particularly such as the one in hand, should be managed from the bench with the most scrupulous and constant regard for the existence of those mere ulterior matters liable to be referred to purposely or apparently so, in a way to improperly influence the jury. That is due to the parties, and is due as well to the jurors themselves. They have the single function to perform of determining the truth as to controverted issues of fact solely from the competent evidence produced in their hearing and the law as given to them by the court. When their true position, and that only, is kept before them from the beginning to the end of the trial, and they are inspired by the guiding hand of the judge to win distinction by putting aside every influence except the evidence and the law proper for their consideration, the jury system is commonly vindicated as being the best that has been designed or is designable for the discovery of truth in the administration of justice. The proceeding under consideration was a wide departure from that standard. It was wholly unnecessary to the ostensible purpose thereof. The effort to interrogate counsel, at the very outset should have been firmly repressed and the attention of the interrogator directed to the only legitimate subject in hand: that of determining whether the juror was in any wise concerned in any insurance company interested in the litigation. The discovery in that regard might well have been obtained by one or two proper questions not calculated to unduly suggest the fact of the company's connection with the case.

In addition to the foregoing the proper solution of the question as to whether the evidence warranted the finding that the steam hammer was defective and thereby it was caused to

make two strokes when only one was intended, producing the
injury complained of, so effectually disposes of this appeal,
and under the present practice, in view of the record, of the
litigation as well, that it does not seem advisable to discuss
any other matter. We will consider such additional matter
briefly.

Nature's unchanging and unchangeable laws and the un-
varying and invariable principles of mechanics cannot be
turned aside by the verdict of a jury, even if the matter con-
cerning the same is given into their hands accompanied by a
judicial suggestion that there may be reasonable doubt in re-
spect thereto. This court has often spoken decisively on that
subject for the guidance of trial courts, as well as for the pur-
poses of the particular cases in which the matter was involved.
*Vorbrich v. Geuder & P. Mfg. Co.* 96 Wis. 277, 71 N. W.
434; *Montanye v. Northern Elec. Mfg. Co., ante,* p. 22, 105
N. W. 1043.

When the evidence in relation to a controverted question of
fact on the one side accords with what must necessarily have
been the case under given undisputed and indisputable cir-
cumstances, and the evidence on the other side is opposed
thereto, obviously there is no room for conflicting reasonable
inferences, consequently no question for solution by a jury.
Whether such situation does or does not exist in any case is a
matter for the court to determine. It cannot escape the re-
sponsibility of solving it and doing so considerately. Such a
situation often presents the most severe test of judicial cour-
age which trial courts are subjected to. Failure to satisfy
such test in all respects gives ground, unjustly it seems, for
much of the criticism often heard of the jury system. The
duty devolves upon the presiding judge, in every jury trial,
before giving the controversy over to the jury for a determina-
tion, of deciding whether, under the evidence and the law ap-
plicable thereto, there can fairly be said to be reasonable in-
ferences favoring one side as well as such inferences favoring

the other, so that the truth of the matter may be with the former or with the latter. It is easy to see that in case of a decision in the affirmative, when the conclusion clearly should be in the negative, the jury must naturally regard such decision as suggesting that their function as to determining a conflict between reasonable inferences is necessarily. called into action. They take the case, in such circumstances, at the hands of the court accompanied by a decision, in advance by paramount authority, that the evidence, in view of the law applicable thereto, will sustain a verdict either way, according as the same may be viewed by them. Upon their going wrong, harsh criticism thereof and of the jury system itself, is quite out of place. The fault is not with the system, but with its administration. *Musbach v. Wisconsin C. Co.* 108 Wis. 57, 69, 84 N. W. 36.

Where the evidence is sufficient only to give rise to mere conjecture in favor of the plaintiff, or to suggest merely a possibility of the truth being as claimed by him—*Hyer v. Janesville,* 101 Wis. 371, 77 N. W. 729; *Sorenson v. Menasha P. & P. Co.* 56 Wis. 338, 14 N. W. 446; *Agen v. Metropolitan L. Ins. Co.* 105 Wis. 217, 225, 80 N. W. 1020; *Spencer v. C., M. & St. P. R. Co.* 105 Wis. 311, 81 N. W. 407; *Stafford v. Chippewa Valley E. R. Co.* 110 Wis. 331, 345, 85 N. W. 1036—or the evidence in his favor is contrary to all reasonable probabilities, the jury are placed in a false position by being directed to determine upon which side are the major and controlling probabilities. The court in such circumstances, without a motion in that regard, should apply the law thereto and dispose of the litigation accordingly. Refusal in that regard, in face of a proper motion invoking judicial action, is no less than the denial of a right. *Finkelston v. C., M. & St. P. R. Co.* 94 Wis. 270, 68 N. W. 1005; *Cawley v. La Crosse City R. Co.* 101 Wis. 145, 77 N. W. 179; *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 330, 80 N. W. 644; *Optenberg v. Skelton,* 109 Wis. 241, 85 N. W. 356. We

are not unmindful that error now and then in respect to such matters is consistent with the most careful judicial administration. What has been said has reference particularly to those extreme cases, of which this is one, which are too plain to admit of any reasonable controversy.

It requires but the most ordinary appreciation of the operation of a machine,—combining a block of steel, weighing 1,250 pounds, more or less, for use as a hammer, suspended above an anvil bed by a piston rod having its upper end armed with a piston head inclosed in a cylinder in the ordinary way for utilizing the power of steam under compression, the whole appliance being erected in a vertical position with connections so as to permit of the piston head being made to oscillate, only by the necessary valves controlling the application of steam being operated by hand power as to each movement of the piston, as in this case; that is, such appliance not having any automatic device to cause the movement of the piston head in one direction to reverse the application of the steam pressure so as to produce a return motion—to perceive that a stroke of the hammer without the appropriate precedent movement of the controlling device is out of the question. It seems perfectly obvious that every movement of the piston head must necessarily be preceded by such appropriate shifting of the controlling device by the person in charge thereof. It follows that these must be regarded as verities respecting the case in hand: When the hammer-boy, as the one attending the machine was called, turned on the steam and raised the controlling lever so as to open the inlet below the piston head and the exhaust above, the hammer necessarily was elevated to a position of readiness for a strike. It could not go back against the steam pressure. It necessarily remained in the position of readiness for a strike, the steam pressure being continued, till the controlling lever was put down opening the exhaust below the cylinder head. After a blow was struck the hammer could not rebound against steam pressure ap-

plied above the piston head to accelerate the downward motion, in case of such acceleration. In case of the steam being cut off instantly upon the blow being delivered there could yet be no return motion to a position requisite for a second strike. The hammer would necessarily remain down by its own weight and by the steam pressure above the piston head as well till such pressure was reduced by condensation. The hammer could not go back for a second strike except in response to a reverse motion of the controlling device, opening the exhaust above the cylinder head and the inlet below. The testimony of a witness to the contrary of this only evidenced ignorance or something worse. Any amount of such contrary evidence could not raise any conflict for solution by a jury. Reasonable doubt respecting the truth of a matter arrived at by methods of positive demonstration cannot be created by any amount of mere speculation or conjecture, or even positive contrary evidence from the mouths of witnesses.

Proof that the machine worked perfectly both before and after the accident, which was very satisfactorily made, cast the burden on plaintiff to show that the alleged second strike of the hammer, if one occurred, was caused by a defect in the appliance. In this we put aside the evidence as to the double and uncontrollable action of the hammer as not worthy of belief. In any event it was efficiently rebutted, so far as such double motion of the hammer suggesting that it was the result of any defect in the machine. *Vorbrich v. Geuder & P. Mfg. Co.* 96 Wis. 277, 71 N. W. 434. There was no attempt to lift the burden thus cast on respondent, except by proof that the alleged second motion of the hammer might have been caused by a leak of steam at the entrance of the piston rod into the cylinder or by water in the cylinder. There was no proof of a definite character that any such leak existed or that there was water in the cylinder. Moreover, it is readily seen that if there were such a leak it could not possibly have caused the alleged undesired motion of the hammer. The entrance

of the piston rod into the cylinder was below the piston head. Such a leak could not have been active except when the hammer was up and the steam pressure was on, and then the effect could only have been a mere waste of energy of a trifling character, necessarily supplied as fast as it occurred in case the steam was on, and otherwise it could only have permitted of a slow descent of the hammer as the steam escaped. In no event could it have caused the cylinder head to rise, lifting the hammer, or have caused any efficient motion of the hammer whatever. The suggestion of water in the cylinder is likewise hardly worthy of consideration. Water in the cylinder below the piston head, in case of any accumulation thereof at that point, would necessarily be forced out by the downward motion of the piston head. Water could have accumulated above the cylinder head only by condensation of the steam which caused the downward motion or a leaky valve, and such accumulation, if one occurred, could not in any event have caused a reverse motion or any motion of the hammer. Neither of the suggested explanations of the alleged double motion of the hammer was supported by anything better than baseless conjecture, as it seems to us. This is in accordance with the evidence and is self-evident.

*By the Court.*—The judgment appealed from is reversed, and the cause remanded with directions to grant the motion made in appellant's behalf for a correction of the verdict, and for judgment in his favor dismissing the action with costs.